APPROVED: _____
CHRISTIAN R. EVERDELL/SERRIN TURNER
CHRISTINE I. MAGDO/KEVIN MOSLEY
Assistant United States Attorneys

DOC # 1

BEFORE:   THE HONORABLE ANDREW J. PECK
          United States Magistrate Judge,
          Southern District of New York

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA         :   SEALED COMPLAINT

        -v.-                     :   Violation of
                                     31 U.S.C. §§ 5314 & 5322(a);
                                     31 C.F.R. §§ 1010.350,
ARTUR MELENTIN,                  :   1010.306(c) & (d), and
                                     1010.840(b)
              Defendant.         :
                                     COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - - x   NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

    ANTHONY GIATTINO, being duly sworn, deposes and says that he is a Special Agent with Homeland Security Investigations ("HSI"), and charges as follows:

## COUNT ONE

**(Willful Failure to File Reports of
Foreign Bank and Financial Accounts)**

    1.  On or before the filing due dates listed below, in the Southern District of New York and elsewhere, ARTUR MELENTIN, the defendant, did knowingly and willfully fail to file with the Commissioner of the Internal Revenue Service ("IRS") a Report of Foreign Bank and Financial Accounts ("FBAR") disclosing that MELENTIN had a financial interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, to wit, at least one foreign bank, securities, and other financial account at a bank located in Cyprus, which had an aggregate value of more than $10,000 during each of the years listed below:

1

| Calendar Year | Due Date to File FBAR | Bank |
|---|---|---|
| 2010 | June 30, 2011 | Hellenic Bank, Cyprus |
| 2011 | June 30, 2012 | Hellenic Bank, Cyprus |

(Title 31, United States Code, Sections 5314 and 5322(a);
Title 31, Code of Federal Regulations, Sections 1010.350,
1010.306(c) & (d), and 1010.840(b).)

The bases for my knowledge and the foregoing charges are, in part, as follows:

2. I am a Special Agent with HSI, and have been in that position for over six years. I have personally participated in the investigation of this matter along with Special Agents from the United States Secret Service ("USSS") and the Internal Revenue Service, Criminal Investigations ("IRS-CI") (collectively, the "Investigative Team"). While with HSI, I have participated in numerous financial investigations.

3. I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, and from my conversations with members of the Investigative Team and others, and have examined documents and other records. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in sum and substance, except where otherwise indicated. Moreover, because this affidavit is submitted for the limited purpose of establishing probable cause supporting the arrests of the defendants, I have not set forth each and every fact learned during the course of this investigation.

### Obligations of United States Taxpayers
### With Respect to Foreign Financial Accounts

4. Based on my training and experience, and my familiarity with U.S. tax filings, I know the following:

    a. Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") are obligated to file a U.S.

2

Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the Internal Revenue Service ("IRS"). At all times relevant to this Complaint, Form 1040 required U.S. taxpayers to report their income from any source, regardless of whether the source of their income was inside or outside the United States. In addition, on Schedule B of Form 1040, the filer must indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account." If the U.S. taxpayer answers that question in the affirmative, then the U.S. taxpayer must indicate the name of the particular country in which the account is located.

        b.    Separate and apart from the obligation to file Forms 1040 that include all worldwide income, U.S. taxpayers who have a financial interest in, or signature authority over, a bank, securities, or other financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR"). The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year. In general, the FBAR requires the U.S. taxpayer to identify the financial institution with which the account is held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

        c.    When a U.S. taxpayer beneficially owns a bank, securities, or other financial account that is maintained outside the United States, but fails to disclose the account or the income generated in the account to the IRS on Schedule B of Form 1040 or on an FBAR, the account is referred to as an "undeclared account."

        5.    Based on my review of immigration files and HSI databases, I know that at all times relevant to this Complaint, ARTUR MELENTIN, the defendant, was a legal permanent resident of the United States and was a U.S. taxpayer.

3

**MELENTIN Sets Up an Undeclared Account in Cyprus**

6.   From my review of travel records, emails, foreign bank records, and other documentary evidence, I know that in or about November 2010, ARTUR MELENTIN, the defendant, traveled to Cyprus and, with the assistance of a close associate ("CC-1"), opened a bank account at a Cyprus-based bank (the "Cyprus Bank") in the name of a shelf company called Manueta Limited, with MELENTIN's mother as the beneficial owner of the account. Specifically, I know the following:

a.   In or about October 2009, CC-1 began a business relationship with a company based in Cyprus that specialized in creating and selling shelf corporations (the "Cyprus Company"). In or about October 2009, the Cyprus Company sold CC-1 the first of many shelf corporations and assisted CC-1 in opening bank accounts in the name of the shelf companies.

b.   Approximately a year later, on or about October 29, 2010, CC-1 received an email from an employee of the Cyprus Company, containing a list of 16 shelf companies that had been created and were available for sale, including a company called Manueta Limited, which was incorporated in Belize. Later that same day, CC-1 forwarded this email to MELENTIN's email account.

c.   On or about November 22, 2010, MELENTIN and his business partner ("CC-2") flew from New York to Cyprus.

d.   On or about November 24, 2010, a bank account for Manueta Limited was opened at the Cyprus Bank. The beneficial owner of the account was listed as Viktoriia Sytnik.[1] MELENTIN's name did not appear on any of the account opening documents. However, a document that was provided to the Cyprus Bank to verify the identity of Viktoriia Sytnik, was emailed to MELENTIN at his email address on or about November 22, 2010, from someone named "Victor Sytnik" using a similar email address.

---

[1] Documents that I have reviewed as part of this investigation indicate that Viktoriia Sytnik is MELENTIN's mother. MELENTIN's immigration paperwork includes a translation of his birth certificate, which lists his mother as "Victoria Kostyantinivna Mospan." Furthermore, in their emails to each other, MELENTIN and CC-1 often referred to the Manueta Limited bank account as the "Mama" account.

4

Furthermore, the mailing address for the account was listed as an apartment owned by CC-1 in the Netherlands, even though Viktoriia Sytnik lived in the Ukraine.

      e.  On or about November 28, 2010, MELENTIN returned from Cyprus to New York.

      f.  On or about December 9, 2010, MELENTIN received an email from an employee from the Cyprus Company informing MELENTIN that the Manueta Limited bank account was active. The email also attached a series of invoices requesting payment for the fees associated with opening the account, broken down as follows:

      Belize Shelf Company - €1,200
      Opening Bank Accounts - €500
      Company's Stamp - €40
      Nominee Director - €350
      Nominee Shareholder - €300
      Registered Office - €250
      Registered Agent - €350
      Government License Fee - €350
      Cyprus Mailing Address - €125
      Total - €3,465

### Transfers into the Undeclared Account

7.  From my review of bank records from the Cyprus Bank and other documentary evidence, I know that from on or about December 30, 2010, through on or about March 29, 2013, approximately $1,161,636.50 was deposited into the Manueta Limited Account and approximately $392,102.73 was withdrawn from the account. I further know that the transfers into the Manueta Limited account originated from companies owned by ARTUR MELENTIN, the defendant, as well as companies and accounts controlled by CC-1. I further know that MELENTIN and CC-1 took steps to conceal the true source and purpose of the funds, which, among other things, allowed MELENTIN to evade paying taxes. For example:

      a.  On or about December 30, 2010, the Manueta Limited account received approximately $22,449 from XS Global Trade & Service B.V., a company based in the Netherlands that CC-1 controlled.

5

i. Approximately two weeks before this transfer, on or about December 14, 2010, CC-1 sent an email to MELENTIN requesting that a bill be sent to XS Global Trade & Service B.V. In the email, CC-1 further stated: "p.s. if possible make it for something computer related / network related services."

ii. On or about December 17, 2010, as requested, MELENTIN sent an invoice for approximately $22,457 from Manueta Limited to XS Global Trade & Service B.V., with a note that the invoice was for "IT Consulting." The invoice contained instructions to send the funds to the Manueta Limited account.

iii. Based on my experience and the evidence set forth above, I believe that CC-1 wanted to transfer money to MELENTIN and asked MELENTIN to provide a fake invoice from Manueta Limited to his company XS Global Trade & Service B.V. for "computer related" services in order to make the transfer appear to have a legitimate business purpose. MELENTIN provided the fake invoice and the transfer occurred shortly thereafter. By receiving payment in the Manueta Limited account, instead of a bank account in the United States, MELENTIN avoided paying U.S. taxes on the income.

b. On or about March 11, 2011, the Manueta Limited account received approximately $155,990 from Zelocal, LLC, a company based in the United States that MELENTIN owns in part.

i. According to tax documents filed by Zelocal LLC, MELENTIN owns 33% of Zelocal LLC.

ii. According to MELENTIN's accountant for the 2011 and 2012 tax years ("Accountant-1"), Accountant-1 was told, in substance and in part, that Zelocal LLC was inactive. In truth and in fact, bank records show that Zelocal LLC transferred a total of approximately $399,980 to Manueta Limited in 2011, including the approximately $155,990 transferred on or about March 11, 2011.

iii. Based on my experience and the evidence in this case, I believe that one purpose of these transfers was for MELENTIN to move money out of the United States to the offshore Manueta Limited account to evade taxes. I further believe that

6

Accountant-1 was told that Zelocal LLC was inactive, and was not informed about these transfers, for the same reason.

        c.    On or about November 10, 2011, the Manueta Limited account received approximately $60,000 from a shelf company based in Cyprus that CC-1 controlled.

           i.    Several months before this transfer, on or about July 1, 2011, MELENTIN and CC-1 exchanged a series of text messages in which MELENTIN asked CC-1 if CC-1's company needed to buy computer equipment, because MELENTIN "need[ed] to transfer 100K anyways."

           ii.    On or about July 19, 2011, in a text chat between MELENTIN and CC-2, MELENTIN discussed buying $60,000 of computer equipment for CC-1 and asked CC-2 "do you want to make it as a part of this year [sic] transfers . . . ?"

           iii.    On or about July 21, 2011, a U.S.-based company owned in part by CC-2 ("Company-1") purchased computer servers and other equipment from a U.S.-based computer company. Computer equipment matching the description and serial numbers of the equipment purchased by Company-1 was later found on the premises of CC-1's company in Costa Rica in May 2013.

           iv.    In or about August and September 2011, MELENTIN sent emails to CC-1 requesting that CC-1 send payment for the computer equipment to the Manueta Limited account. In an email on or about September 14, 2011, MELENTIN specifically told CC-1 to send $60,000 to "Mama's bank account" and provided the account number for the Manueta Limited account.

           v.    On or about November 10, 2011, CC-1 transferred approximately $60,000 from an offshore account controlled by CC-1 to MELENTIN's Manueta Limited account.

           vi.    Based on my experience and the evidence in this case, I believe that MELENTIN's discussions with CC-1 and CC-2 about a "transfer [of] 100K" and "this year [sic] transfers" indicate that MELENTIN and CC-2 wanted to transfer approximately $100,000 from U.S. bank accounts to offshore bank accounts to avoid paying U.S. taxes. I further believe that by purchasing $60,000 of computer equipment for CC-1's company in Costa Rica and then receiving payment for the equipment in the

7

offshore Manueta Limited account, MELENTIN and CC-2 avoided paying U.S. taxes.

### MELENTIN's Willful Failure to File an FBAR for 2010 and 2011

8.  Based on the evidence described above, I believe that ARTUR MELENTIN, the defendant, had control over the Manueta Limited account, and that MELENTIN, not Viktoriia Sytnik, was the true beneficial owner of that account. Furthermore, I have reviewed recorded telephone calls between MELENTIN and CC-1 which confirm this. Specifically, I have reviewed the transcript of a recorded call between MELENTIN and CC-1 on or about March 27, 2013, in which they discussed restrictions on transfers from Cyprus bank accounts that had been put in place as part of an international bailout of the Cypriot financial system. In the call, MELENTIN expressed his concern that the funds in the Manueta Limited account, which totaled roughly $769,533.77 at that time, were frozen:

> MELENTIN: So, what, are we all dying from heart attacks?
> CC-1: . . . everything's quiet, if you lie low for a month or so, it will have virtually no impact on you.
> MELENTIN: Good.
> CC-1: Because restrictions . . . have only been imposed on transfers that are about to happen, to prevent a massive outflow, if you sit tight for three or four weeks, everything will work the same way as before. It is the only stable bank left.
>
>             *    *    *
>
> MELENTIN: Oh, listen, that's great then.
> CC-1: Yup, stability is guaranteed.
> MELENTIN: I was truly depressed today about this matter.

9.  From my review of bank records, I know that the Manueta Limited account had a balance that exceeded $10,000 from the time of the first deposit of $22,449 on or about December

8

30, 2010, until the account was restrained in March 2013, at which time the account balance was approximately $769,533.77. Accordingly, ARTUR MELENTIN, the defendant, was required to file an FBAR on June 30, 2011 (for the 2010 calendar year) and on June 30, 2012 (for the 2011 calendar year).

10. From my review of the tax filings of ARTUR MELENTIN, the defendant, I know the following:

    a. For the 2010 and 2011 calendar years, MELENTIN filed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040. On each of these returns, MELENTIN failed to report income received by MELENTIN in the Manueta Limited account in Cyprus. MELENTIN also did not file a Schedule B with each of these returns, disclosing that MELENTIN had an interest in and signature and other authority over the Manueta Limited account at the Cyprus Bank.

    b. For the 2010 and 2011 calendar years, MELENTIN failed to file, and failed to cause to be filed, with the IRS an FBAR disclosing his signatory and other authority over the Manueta Limited account at the Cyprus Bank.

11. Based on the evidence described above, as well as interviews with accountants who prepared personal and business tax returns for ARTUR MELENTIN, the defendant, I believe that MELENTIN was aware of his obligation to disclose his interest in the Manueta Limited account at the Cyprus Bank and to file an FBAR for the 2010 and 2011 calendar years, and that his failure to do so was knowing and willful. For example:

    a. The accountant who prepared MELENTIN's personal and business tax returns for the 2010 calendar year ("Accountant-2") stated, in sum and substance, that it is his practice to meet with his clients in person each year and to ask them if they have foreign bank accounts. According to Accountant-2, the fact that MELENTIN's 2010 tax return does not disclose a foreign bank account indicates that MELENTIN likely told Accountant-2 that he did not have one.

    b. The accountant who prepared MELENTIN's personal and business tax returns for the 2011 calendar year ("Accountant-1") stated, in sum and substance, that in June of each year, when FBARs are due, he asks all of his clients that do business with foreign companies if they have foreign bank

accounts. According to Accountant-1, because MELENTIN's 2011 tax return does not disclose a foreign bank account, Accountant-1 believes that MELENTIN told Accountant-1 that he did not have a foreign bank account.

WHEREFORE, the deponent respectfully requests that an arrest warrant be issued for ARTUR MELENTIN, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
ANTHONY GIATTINO
Special Agent
Homeland Security Investigations


Sworn to before me this
____ day of August, 2015

AUG 0 5 2015

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

10