UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
            -  v.  -                      :          15 Cr. 856 (VEC)
                                          :
ARTUR MELENTIN                            :
                                          :
            Defendant.                    :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### SENTENCING MEMORANDUM
### ON BEHALF OF ARTUR MELENTIN


PETRILLO KLEIN & BOXER LLP

655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391

*Attorneys for Artur Melentin*


Dated:  May 16, 2016

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

I.     A NON-CUSTODIAL SENTENCE IS WELL WARRANTED
      UNDER 18 U.S.C. § 3553(a) ............................................................................ 1

     A.    Applicable Legal Standards .................................................................. 1

     B.    History and Characteristics of the Defendant ....................................... 2

          1.    Artur, a Recent Immigrant, Has Built a Successful Business
              Employing Dozens .................................................................. 3

          2.    Artur's Commitment to his Family ......................................... 5

          3.    Artur's Contributions to Charity and Community ..................... 5

          4.    Artur's Devotion to Friends .................................................... 7

          5.    Remorse ................................................................................. 8

     C.    The Nature and Circumstances of the Offense ..................................... 9

          1.    Unreported Subject Account .................................................... 9

          2.    That Thousands of Offshore Accountholders Have Received
              Immunity From Prosecution Under DOJ Amnesty Programs Helps
              to Define the Relative Seriousness and Degree of the Conduct ............... 10

     D.    The Advisory Guidelines Calculation Overstates the Seriousness of the
        Offense ............................................................................................... 12

          1.    The "Value of Funds" Calculation in U.S.S.G. § 2S1.3(a)(2)
              Substantially Overstates the Seriousness of the Offense Conduct ........... 12

           2.    The Guidelines Calculated Under U.S.S.G. § 2S1.3 Bear no
              Relationship to the Tax Loss Associated With the Offense Conduct ....... 14

     E.    A Sentence of Probation Would be Consistent With the Goal of Avoiding
        Unwarranted Sentencing Disparities ...................................................... 15

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

F.     Neither Specific Nor General Deterrence Will Be Served by a Custodial Sentence ........................................................................................ 21

G.     Available Sentences ................................................................................ 22

II.     REQUEST FOR SENTENCE OF PROBATION ............................................... 23

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 2, 23

*Kimbrough v. United States*, 552 U.S. 85 (2007) ......................................... 2

*Nelson v. United States*, 555 U.S. 350 (2009) ............................................. 2

*Pepper v. United States*, 562 U.S. 476 (2011) ............................................. 2

*Rita v. United States*, 551 U.S. 338 (2007) .................................................. 14

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................... 7

*United States v. Booker*, 543 U.S. 220 (2005) ............................................. 1

*United States v. Canova*, 412 F.3d 331  (2d Cir. 2005) ................................. 7

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*) ................... 2

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) .................................... 2

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) ......................... 22

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ...................................... 7

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ...................................... 2

*United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006) ........................ 2

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ................................... 7

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2008) (*en banc*) .................... 22

**Statutes:**

18 U.S.C. § 3553 .............................................................................. 1, 2, 15

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

28 U.S.C. § 991 ................................................................................................................. 15

31 U.S.C. § 5321 ........................................................................................................... 1, 10

31 U.S.C. § 5314 ............................................................................................................... 1

31 U.S.C. § 5322 ............................................................................................................... 1

**Sentencing Guidelines**

U.S.S.G. § 2B1.1 ............................................................................................................. 13

U.S.S.G. § 2S1.3 .......................................................................................................... 12, 14

U.S.S.G. § 2T1.1 ............................................................................................................. 14

U.S.S.G. § 2T4.1 ............................................................................................................. 14

**Regulations**

31 C.F.R. § 1010.350 ....................................................................................................... 13

**Other Authorities:**

"Offshore Compliance Initiative," available at https://www.justice.gov/tax/
    offshore-compliance-initiative. ................................................................................. 22

2012 Offshore Voluntary Disclosure Program, available at
    https://www.irs.gov/uac/2012-Offshore-Voluntary-Disclosure-Program ............................... 11

A Report to Congress in Accordance with § 361(b) of the Uniting and
    Strengthening America by Providing Appropriate Tools Required to
    Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act) (April 26, 2002)
    available at http://www.fincen.gov/news_room/rp/files/fbar.pdf ................................... 10

Defendant's Sentencing Memorandum, *United States v. Alan*,
    10-cr-160 (W.D. Pa.) (ECF No. 56) ............................................................................ 19

Government's Memorandum in Aid of Sentencing, *United States v. Briguet*,
    15-cr-00050 (E.D.N.Y.) (ECF No. 19). ....................................................................... 16

Government's Response to Defendant's Sentencing Memorandum,
    *United States v. Alan*, 10-cr-160 (W.D. Pa.) (ECF No. 62) ............................................ 20

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Government's Sentencing Memorandum, *United States v. Ahuja*,
   11-cr-135 (E.D. Wisc.) (ECF No. 194)...................................................................... 20

Government's Sentencing Memorandum, *United States v. Canale*,
   14-cr-713 (S.D.N.Y.) (ECF No. 39). ........................................................................ 16

Government's Sentencing Memorandum, *United States v. Desai*,
   11-cr-846 (N.D. Cal.) (ECF No. 279)........................................................................ 20

Government's Sentencing Memorandum, *United States v. Doane*,
   12-cr-00630 (S.D.N.Y.) ............................................................................................ 15

Government's Sentencing Memorandum, *United States v. Reiss*,
   11-cr-668 (S.D.N.Y.) (ECF No. 16). ........................................................................ 19

Government's Sentencing Memorandum, *United States v. Wajsfelner*,
   12-cr-641 (S.D.N.Y.) (ECF No. 10). ........................................................................ 18

Indictment, at 1, *United States v. Alan*, 10-cr-160 (W.D. Pa.) (ECF No. 56)............................. 20

Memorandum from Heather C. Maloy, Commissioner, Large Business and
   International, Karen M. Schiller, Commissioner, Small Business/Self-Employed,
   Sunita B. Lough, Commissioner, Tax Exempt and Government Entities, Titled
   "Linda E. Stin: Deputy Commissioner for Services and Enforcement, titled
   "Interim Guidance for Report of Foreign Bank and Financial Accounts (FBAR)
   Penalties" (May 13, 2015), available at https://www.irs.gov/pub/foia/ig/spder/
   SBSE-04-0515-0025[1].pdf. ...................................................................................... 14

Memorandum from Linda E. Stin: Deputy Commissioner for Services
   and Enforcement, titled "Authorization to Apply Penalty Framework to Voluntary
   Disclosure Requests Regarding Unreported Offshore Accounts and Entities"
   (Mar. 23, 2009), available at http://www.irs.gov/pub/newsroom/memorandum
   authorizing penalty framework.pdf.............................................................................. 11

Plea Agreement, *United States v. Heller*, 10-cr-388 (S.D.N.Y.)
   (ECF No. 58 at Ex. G). .............................................................................................. 19

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Position of the United States on Sentencing, *United States v. Cambata*,
15-cr-362 (E.D.Va.) (ECF No. 17). ........................................................... 17

Press Release, U.S. Attorney's Office, District of New Jersey, New Jersey UBS Client
Pleads Guilty to Failing to Report More Than $2 Million in Swiss Bank Account
(July 1, 2010), available at https://www.justice.gov/opa/pr/new-jersey-ubs-client-pleads-
guilty-failing-report-more-2-million-swiss-bank-account. ...................................... 18

Press Release, U.S. Attorney's Office, North District of Illinois, H. Ty Warner
Sentenced To Probation After Paying $80 Million In Taxes And Penalties For
Tax Evasion On Funds Hidden In Secret Swiss Bank Accounts (January 14, 2014),
available at https://www.justice.gov/usao-ndil/pr/h-ty-warner-sentenced-
probation-after-paying-80-million-taxes-and-penalties-tax-evasion. ...................................... 18

Press Release, U.S. Attorney's Office, Southern District of Florida, South
Florida Retired Businessman Pleads Guilty to Failing to Disclose Assets Held
in Swiss Banks (May 30, 2012), available at https://www.justice.gov/opa
/pr/south-florida-retired-businessman-pleads-guilty-failing-disclose-assets-
held-swiss-banks. ........................................................... 17

Press Release, U.S. Attorney's Office, Southern District of New York, Kentucky
Resident Pleads Guilty In Manhattan Federal Court To Hiding Hundreds Of
Thousands Of Dollars In Secret Swiss Bank Accounts (August 5, 2015),
available at https://www.justice.gov/usao-sdny/pr/kentucky-resident-pleads-
guilty-manhattan-federal-court-hiding-hundreds-thousands. ...................................... 16

Press Release, U.S. Attorney's Office, Southern District of New York,
Massachusetts Man Sentenced In Manhattan Federal Court For Hiding
Millions From IRS In Swiss Bank Accounts (March 5, 2013), available at
https://www.justice.gov/usao-sdny/pr/massachusetts-man-sentenced-
manhattan-federal-court-hiding-millions-irs-swiss-bank. ...................................... 18

Press Release, U.S. Attorney's Office, Southern District of New York, New
Jersey Doctor and Medical Professor Sentenced in Manhattan Federal Court
for Failing to Inform the IRS of Millions in Swiss Bank Accounts
(January 11, 2012), available at https://www.justice.gov/archive
/usao/nys/pressreleases/January12/reissmichael ...................................... 19

Second Special Voluntary Disclosure Initiative Opens, IRS (Feb. 8, 2011),
http://www.irs.gov/ ........................................................... 11

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Sentencing Memorandum, *United States v. Heller*, 10-cr-388 (S.D.N.Y.)
(ECF No. 59)......................................................................................................... 19

Sentencing Memorandum, *United States v. Hernandez*, 10-cr-334 (S.D.N.Y.)
(ECF No. 11)......................................................................................................... 19

Statement of Facts, at 1-2, *United States v. Gardellini*, 06-cr-355 (D.D.C.)
(ECF No. 7)........................................................................................................... 17

United States Department of Justice Offshore Compliance Initiative at
http://www.justice.gov/tax/............................................................................... 11

*United States v. Bachmann*, 11-cr-00095 (E.D.Va.)................................................. 15

## PRELIMINARY STATEMENT

We respectfully submit this Memorandum on behalf of our client, Artur Melentin ("Artur"), in connection with the sentencing proceeding scheduled for May 23, 2016.   On January 11, 2016, Artur pleaded guilty to an Information charging him in one count with failing to file Reports of Foreign Bank and Financial Accounts ("FBARs") in tax years 2010 and 2011, in violation of 31 U.S.C. §§ 5314, 5322.  Artur has complied with all of the terms of his plea agreement.[1]

As set forth in more detail below, we respectfully submit that a noncustodial sentence would be just and appropriate in the circumstances of this individual and this case.  The Probation Department, after reviewing the matter in depth and interviewing Artur, has recommended the same.  *See* Presentence Report ("PSR"), at 26.  Such a sentence would serve all of the relevant purposes of sentencing in the circumstance presented and, importantly, allow Artur, who has accepted responsibility for his conduct and is determined to conduct himself honorably and lawfully, to continue uninterrupted his productive business endeavors, which provide employment to many, and his significant contributions to the community.[2]

## I.     A NON-CUSTODIAL SENTENCE IS WELL WARRANTED UNDER 18 U.S.C. § 3553(a)

### A.     Applicable Legal Standards

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory."

---

[1]       In accordance with the plea agreement, this week, Artur will file amended personal tax returns for 2010, 2011, and 2012, and pay $71,369 in taxes and interest to the IRS.  The plea agreement also provides for payment of a civil FBAR penalty of $50,279.55, *see* 31 U.S.C. § 5321(a)(5)(C), within two weeks of sentencing.  We respectfully request that the Court order the release of $50,000 that is currently held as security for the $250,000 personal recognizance bond in this case to allow Artur to put such sum toward payment of this civil FBAR penalty.

[2]       Artur has no criminal history.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

*United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).  Although the Guidelines are to be given "fair consideration" "before imposing" a sentence, "in the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (internal quotations and citations omitted).  Concerning this individualized assessment, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original).  Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted); *Gall v. United States*, 552 U.S. 38, 47 (2007) (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

Under § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)." *Dorvee*, 616 F.3d at 182; *see also United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("[I]f a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher [one].").  In doing so, Congress required consideration by the Court of (1) the nature of the offense and the history and characteristics of the defendant; (2) the purposes of sentencing, described in

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

§3553(a)(2) as (a) the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) the need to afford adequate deterrence to criminal conduct; (c) the need to protect the public from future criminal conduct by the defendant; and (d) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines and their policy statements; (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution. 18 U.S.C. § 3553(a).

As discussed below, a thorough consideration of these factors well warrants a non-custodial sentence in this case.  *See* PSR at 26 ("In evaluating the nature and circumstances of the offense, as well as the history and characteristics of the defendant, we believe that a term of custody would be greater than necessary to meet the ends of sentencing.").

> ### B.  History and Characteristics of the Defendant
>
> #### 1.  Artur, a Recent Immigrant, Has Built a Successful Business Employing Dozens

Artur was raised by his mother and stepfather[3] in Dnipropetrovsk, Ukraine, which is approximately 230 miles southeast of Kiev, the capital of Ukraine.  PSR ¶ 39.  As his mother and brother recount in letters to this Court submitted with this Memorandum, *see* Exs. 3-4[4], Artur excelled in his studies at school and participated in several national competitions known as Olympiads in the sciences and linguistics.  *See* Exs. 3-4.  As a result, he was invited to attend Lyceum of Information Technologies, a prestigious school in Ukraine for talented students.  *See*

---

[3]     Artur has had no contact with his biological father since he was about two years old.  PSR ¶ 38.

[4]     The letter from Artur's mother, Viktoria Sytnik, which is attached as Exhibit 3, was translated by Artur from Russian to English.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Ex. 3.  After graduating, Artur attended Kiev National Economic University, earning an MBA in marketing in 2005.  PSR ¶¶ 52-53.

While studying for his MBA, Artur worked freelance in website and logo design and HTML programming for companies in Ukraine, Russia, France, Israel, and the United States.  In 2006, he secured a job with Global Advertising Strategies ("GAS") in New York.  At GAS, Artur quickly became highly productive, contributing to the creative development and implementation of digital marketing campaigns for, among other companies, Lufthansa, MoneyGram, and Vonage.

In August 2008, Artur, with two colleagues, decided to start their own business.  They founded Findr Interactive ("Findr"), a digital advertising agency that would specialize in website and mobile application development and the creation of online media and social marketing campaigns.  *See* PSR ¶ 57.  Later, Artur and others formed two additional companies, Gravity Media ("Gravity"), which specializes in developing and managing multi-cultural advertising campaigns, and Triomphant Communications ("Triomphant"), a public relations firm that assists businesses with reputational and crisis management.  *See id.*

Today, these three companies (collectively, the "Findr Group") together employ more than forty-five people. *See* Ex. 5.  Findr Group's clients have included Comcast, Dish Network, Prudential, DirectTV, Caesars Entertainment, and BlueCross BlueShield.  The companies' work has already garnered industry accolades.  In 2014 and 2015, for example, Advertising Age named Findr Group the number one cultural agency.

Findr Group has also performed work for public sector clients.  For example, the company, to aid the U.S. Army in its efforts in Afghanistan, assisted the Army in developing an award-winning advertising campaign to recruit cultural interpreters in Pashto, Dari, and Farsi.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Artur serves as the Chief Creative Officer of Findr Group.  His responsibilities include management of the creative/development team, developing marketing strategies, business development, and managing Findr Group's IT infrastructure.  He is the central creative force behind Findr Group's success.  As explained by Lillian Laskin, a managing partner of Gravity, Artur is "integral" to the business; his "vision and passion has been a key driver on the company's growth."  Ex. 5.

2.      Artur's Commitment to his Family

As Artur's business and personal lives have developed in the United States, he has remained committed and devoted to his family in Ukraine.  As his mother notes, Artur has been steadfast in supporting his family financially and emotionally in a time of economic devastation and military conflict in Ukraine.  *See* Ex. 3; *see also* Ex. 2.  Late last year, Artur flew his parents to Paris and met them there.  As his mother recalls, this was the first time she had ever vacationed outside of Ukraine.  *See id.*  Artur has also been a role model to his younger half-brother, Viktor, providing professional guidance and support, as Viktor works toward a career in information security.  *See* Ex. 4.

3.      Artur's Contributions to Charity and Community

Artur is grateful for the opportunities that the United States has afforded him, and has contributed time and money to a number of community and charitable causes.   Through Findr Group, for example, he has provided *pro bono* services including the following:

- The development of a social media campaign for Safe Horizon, which is the largest non-profit victim services agency in the United States providing assistance to victims of domestic abuse, sexual abuse, and human trafficking;

- The planning of events and strategic consulting for Vital Voices Global Partnership ("VVGP"), an organization that identifies, trains and empowers emerging women leaders; and

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

- The design of promotional materials for Gay Men's Health Crisis, a leading provider of HIV/AIDS prevention, care and health care advocacy.

Artur's commitment to charity and civic good works is a repeat subject of comment in the letters submitted by friends and colleagues.  Monique Tapie, Artur's friend and partner in Triomphant, writes, for example, as follows:

> In addition to our paid clients, our work also focuses on philanthropic areas in support of two particular organizations.  The first being the Fresh Youth Initiative, an organization that leads in helping immigrant and bicultural youth from distressed communities in NYC succeed in their transition and most importantly their education.  The second being Safe Horizon, the leading organization in NYC combatting domestic violence, human trafficking and LGBT teen homelessness.

> Albeit, Mr. Melentin and I work on a variety of client needs, the most important has been our voluntary work in the areas of youth development and with Safe Horizon.  Artur has always tirelessly given of his time and skill to support all of which he has been approached with.  Not having him do so in our work with Safe Horizon would negatively impact the preparations and campaign work to be rolled out during Domestic Violence month in October.  The issue of domestic violence is personal to both Artur and I and his presence, participation and work is invaluable to the success of our overall efforts.

> What has impressed me the most is that through this challenging time, whereas the stress of his current legal situation has caused him sleeplessness, weight loss, self-guilt and sadness, Artur has never floundered in his support of our work for the organizations we support.  In addition, he continues to be fully active in the causes he has long taken part in - for this is who he truly is.  The legal situation for which he holds himself accountable has truly taken its toll, yet unlike many he continues to forge on with what is also imperative to life and that is the work we do.

Ex. 6.

> William Radin, a close friend, describes Artur's community involvement as follows:

> Artur takes his civic responsibility as an American seriously and actively participates in government, including advocating for legislative change in support of LGBT rights via LAMBDA Legal.  Additionally, Artur has devoted his time to the advancement of numerous charitable causes.  In particular, he has given time and support to groups championing human rights and services for the LGBT community, NY Anti-Violence Project, the Stonewall Foundation, and the Trevor Project, which has as its mission suicide prevention.  I have personally worked with Artur in fundraising efforts for charities promoting blood cancer research and treatment, and housing for at risk populations.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Ex. 7.

Artur's public-spirited disposition is further echoed in a letter from Nancy Prager-Kamel,

the U.S. National Commissioner for United Nations Educational, Scientific and Cultural

Organization and the main representative of VVGP to the United Nations.  Ms. Prager-Kamel

describes Artur's gracious offer of services in connection with a VVGP event honoring Vice

President Biden.  *See* Ex. 8; *see also* Ex. 9 (Letter from John Westfall-Kwong).

Artur's community service and charitable works merit substantial consideration in the

balance of sentencing factors.[5]

4.    Artur's Devotion to Friends

Artur's acts of kindness extend beyond his contributions of time and money to charities

and community.  He has also been a true friend to many, always ready to help when needed.

Brian Friedman, Artur's friend, describes two such examples of Artur's generosity:

> When our mutual friend, Matt, was diagnosed with colon cancer at the same time that he
> lost his apartment, Artur opened his home to house Matt and provided whatever
> additional support Matt needed.  When Matt was in recovery, having just completed
> radiation treatment, Artur and I alone took Matt to celebrate his birthday; Artur assumed
> the lead to ensure that it was a very special experience at his favorite Russian home-
> cooking restaurant.

> When another friend, battling alcohol abuse, required an intervention, Artur was one of
> two friends who joined me to support our friend.  Artur offered his own therapist and
> provided incredible emotional and logistical support that enabled our friend to begin to
> recover.

---

[5]    *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("As these examples attest,
Adelson's good deeds were not performed to gain status or enhance his image.  Most of them were unknown to all
but a few people until the time of his sentencing.  But, surely, if ever a man is to receive credit for the good he has
done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of
his sentencing, when his very future hangs in the balance."); *see also United States v. Canova*, 412 F.3d 331, 358-59
(2d Cir. 2005) (affirming downward departure based on defendant's extraordinary good works); *United States v.
Howe*, 543 F.3d 128, 137-38 (3d Cir. 2008) (affirming sentence of probation with three months home confinement
for wire fraud when advisory guidelines range was 18-24 months because defendant made an isolated mistake in the
context of his entire life, including devotion to family, community and church); *United States v. Thurston*, 544 F.3d
22, 26 (1st Cir. 2008) (affirming three-month sentence for Medicare fraud conspiracy of more than $5 million based
on, among other things, defendant's charitable work, community service, generosity with his time and support and
assistance of others).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Ex. 10.  Artur's close friend, Dovile Drizyte, also describes how Artur provided indispensable

support to her at a time when she was endeavoring to escape an abusive marriage:

> I have been living in an abusive relationship for a while and if not for Artur's help and
> support I would have never been able to leave what was a true nightmare.  My soon to be
> ex-husband was a violent individual with deeply rooted psychological problems as well
> as addiction to substance and I cannot count how many times Artur came to save me,
> offered me his home, financial and moral support.  It is by virtue of his generosity, after I
> was forced to leave my home, I have a roof over my head, as I have been living at his
> residence since August, 2015.  He also guided me through this most difficult time of my
> life, kept my hope that there's a brighter future, alive.  His encouragement of seeing
> psychological and legal help was indeed crucial.  Even though he was going through this
> extremely stressful and challenging moment in his life, he found strength to carry us both
> through.  I would have not survived if Artur was not there for me.

Ex. 11.

     5.    <u>Remorse</u>

The letters from Artur's friends and family communicate that Artur's failure to file

FBARs in 2010 and 2011 stands in stark contrast to the life he has led and the ethical standards

he has set for himself.   This clash of his standards with his conduct in this case has caused Artur

remorse and shame.  As Mr. Radin describes:

> As a friend, it has been painful to see what these proceedings have done to Artur.  A
> normally social and accessible individual, Artur has become increasingly withdrawn from
> public life. While still an active supporter of the aforementioned causes, his presence has
> diminished and there has been a reluctance to interact.  Generally, there seems to be a
> fear of association, given this legal proceeding and its reputational impact.  It is hard for
> me to see a person who helped and comforted others be so ostracized.  From a business
> perspective, the stress of these proceedings have adversely impacted his performance and
> forced him into a leave of absence.  Conversationally, many times, Artur has conveyed to
> me regret in his past choices and accepted full responsibility. It is clear to me that through
> this ordeal, Artur has learned a lot, endured a lot, and is very remorseful.

Ex. 7.  Another close friend of Artur's, Brian Delshad, observes as follows:

> Artur is the first person I would call on in a moment of hardship and uncertainty.  His
> loyalty, companionship, and kindness as a friend cannot be quantified.  Life for me, as for
> many of our mutual friends, would simply not be the same without his friendship.  As one
> of his closest friends, I have watched him suffer gravely through this trouble with the

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

law.  It's as if he has been imprisoned, mentally, since the charges were raised against him.  I can assure you that he is overwhelmed with remorse and wants to continue living a law abiding future.  I plead with you to be merciful in his conviction.

Ex. 12.

This case has taken an enormous toll on Artur.  He deeply regrets his conduct, which he views as an insult to the country that has offered him so many opportunities:

> Coming to this country opened the door to many opportunities for me.  Through hard work, passion and dedication I was able to achieve quite a lot in the business world, especially within last couple of years.  I was able to help my family financially since my very arrival here.  I was able to help a lot of people around me.  Standing stronger on my feet I have adopted charitable causes that I support through my work, personal time and contributions. I did achieve the "American dream" it seems. With my actions, however, I turned it into a nightmare.
>
> I deeply regret not reporting my foreign bank account.  I am truly sorry for the burden I have imposed on Your Honor and this Country. Most of my friends and my entire family is aware of the situation.  This stain deeply affected me on a psychological, personal and business levels.  I am going through a learning curve to be able to function productively again and resume my business activities to the full extent and be of an assistance to this Country.  This matter will, however, forever be a reminder of my poor judgment and how I betrayed a Country that has given me so much.

Ex. 2.

### C.    The Nature and Circumstances of the Offense

#### 1.    Unreported Subject Account

Artur had a beneficial interest in twenty-five percent (25%) of the funds in account number CY5800500240000240075377401, held in the name Manueta Limited at Hellenic Bank in Cyprus, and failed to disclose this account on FBARs for tax years 2010 and 2011.  As reflected in his plea of guilty, Artur has fully accepted responsibility for his offense.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

In fulfilment of his plea agreement, this week, Artur will, with the assistance of a tax specialist, file amended returns that will include payment for an additional $51,174 in taxes owed to the IRS for years 2010 and 2011.[6]

> 2.      That Thousands of Offshore Accountholders Have Received Immunity From Prosecution Under DOJ Amnesty Programs Helps to Define the <u>Relative Seriousness of the Conduct</u>

Without minimizing the seriousness of Art's failure to file FBARs, we respectfully submit that the nature and relative seriousness of his offense should be viewed in the context of how the United States has generally dealt with the phenomenon of unreported offshore accounts. Specifically, tens of thousands of offshore accountholders, through amnesty programs, have entered into civil resolutions to resolve open liability pertaining to FBAR violations – thus avoiding criminal charges and the payment of a 50% civil penalty under 31 U.S.C. § 5321(a)(5)(C).   The judgment made by the United States that in this arena it is appropriate to employ amnesty programs rather than rely on criminal enforcement alone reflects the government's assessment both of the broad extent of historical non-compliance with the FBAR requirement and the relative seriousness of the offense as compared to other criminal violations

Before 2009, as documented in a report by the Secretary of the Treasury to Congress, compliance by U.S. taxpayers with the FBAR reporting requirements was limited.[7]  In 2009,

---

[6]      The plea agreement also required Artur to file amended tax returns for 2012 and 2013, if applicable. Artur's 2013 tax return did not require amendment.  Artur's 2012 amended tax return will be filed this week, with minor amendments, and $12,231 in taxes and $1,191 in interest for calendar year 2012 will be paid to the IRS. Artur intends to file amended New York State tax returns upon his expected acceptance into New York State's Voluntary Disclosure Program.  Such amended New York State tax returns will reflect an additional $584 in unpaid taxes in 2010, $15,195 in unpaid taxes in 2011, and $3,590 in unpaid taxes in 2012.

[7]      *See* A Report to Congress in Accordance with § 361(b) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act) (April 26, 2002), at 6, available at http://www.fincen.gov/news_room/rp/files/fbar.pdf ("Extrapolating from the limited information available concerning the number of foreign bank and credit card accounts held by United States citizens, the IRS estimates that there may be as many as 1 million U.S. taxpayers who have signature authority or control

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

when UBS AG, Switzerland's largest bank, entered into a deferred prosecution agreement with the Government, UBS agreed to disclose to the government the names of U.S. taxpayers who held offshore UBS accounts.[8]  A month after announcement of the DPA, on March 23, 2009, the Internal Revenue Service announced a formal offshore voluntary disclosure program ("OVDP"), which allowed U.S. taxpayers with undisclosed foreign accounts to apply to resolve their liability civilly.[9]   The 2009 OVDP program was succeeded by a modified OVDP in 2011[10] and an open-ended OVDP that began in 2012.[11]   As of June 2014, under the program, more than 45,000 offshore accountholders have received immunity from prosecution in connection with the OVDPs.[12]

That the Government has, as a policy matter, provided for amnesty for violators of the FBAR reporting requirement places the offense in a category unlike virtually all other federal criminal offenses.   In the Court's assessment of the relative seriousness of the instant offense, we respectfully submit that this factor argues in favor of mitigation of sentence.

---

over a foreign bank account and may be required to file FBARs. Thus, the approximate rate of compliance with the FBAR filing requirements based on this information could be less than 20 percent.").

[8]       *See* United States Department of Justice Offshore Compliance Initiative at http://www.justice.gov/tax/ offshore-compliance-initiative.

[9]       *See* Memorandum from Linda E. Stin: Deputy Commissioner for Services and Enforcement, titled "Authorization to Apply Penalty Framework to Voluntary Disclosure Requests Regarding Unreported Offshore Accounts and Entities" (Mar. 23, 2009), available at http://www.irs.gov/pub/newsroom/memorandum authorizing penalty framework.pdf.

[10]      *See* Second Special Voluntary Disclosure Initiative Opens, IRS (Feb. 8, 2011), http://www.irs.gov/ newsroom/Article/0,,id=235695,00.html.

[11]      *See* 2012 Offshore Voluntary Disclosure Program, https://www.irs.gov/uac/2012-Offshore-Voluntary-Disclosure-Program.

[12]      *See* FS-2014-6, IRS Offshore Voluntary Disclosure Efforts Produce $6.5 Billion; 45,000 Taxpayers Participate, https://www.irs.gov/uac/Newsroom/IRS-Offshore-Voluntary-Disclosure-Efforts-Produce-$6.5-Billion%3B-45,000-Taxpayers-Participate (June 2014).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

**D.      The Advisory Guidelines Calculation Overstates the Seriousness of the Offense**

The Guidelines calculation set forth in the plea agreement and adopted by the Probation Department results in an adjusted offense level of 17 and criminal history category of I, yielding an advisory Guidelines range of 24-30 months.  This calculation and range result from application of U.S.S.G. § 2S1.3.  Section 2S1.3(a)(2) provides that the base offense level is "6 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds."  The term "value of funds" is defined in Comment 1 to "mean[] the amount of the funds involved in the structuring or reporting conduct." Section 2S1.3(c)(1), which applies here, provides that "[i]f the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above."

As recognized by the Probation Department, and as explained further below, it is respectfully submitted that these Guidelines substantially overstate the seriousness of the offense for two reasons, thus providing a strong basis for a substantial departure downward.

1.      The "Value of Funds" Calculation in U.S.S.G. § 2S1.3(a)(2) Substantially Overstates the Seriousness of the Offense Conduct

Because, here, the "value of funds" under U.S.S.G. § 2S1.3(a)(2) is the maximum value of the account, instead of the maximum value of Artur's interest in the account, Artur's offense level is 17 instead of 13 solely because Artur's money was held in a co-owned account in which others also held money.  This circumstance is not accounted for by the Guidelines, and results in an over-statement of the severity of the offense.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

By way of background, pursuant to 31 C.F.R. § 1010.350, and as described in Paragraph 7 of the PSR, the FBAR requires taxpayers to identify "the maximum value of the account during the calendar year for which the FBAR is being filed."  PSR ¶ 7.  For Guidelines purposes, therefore, the "value of the funds" "involved in the structuring or reporting conduct" under U.S.S.G. § 2S1.3(a)(2) is the maximum account balance during the calendar year that the FBAR was required to be filed.  Here, an FBAR filed on or before June 30, 2012, under this regime, should have reported the maximum balance of the Manueta account in 2011, $402,236.40.  This maximum account balance gives rise to the 12-level increase under U.S.S.G. § 2B1.1(b)(1)(G). *See* PSR ¶ 22.

The Guidelines, however, do not account for the fact that Artur's share of the $402,236.40 maximum account balance in 2011 was 25%, or $100,559.10.  If the offense had rather involved an account owned by him at a foreign financial institution containing $100,559.10, the resulting offense level (assuming the 2-level increase under U.S.S.G. § 2S1.3(b)(2) and the three-level downward adjustments under U.S.S.G. § 3E1.1) would be 13, there would be an 8-level increase under U.S.S.G. § 2B1.1(b)(1)(E), and a Guidelines range of 12-18 months' imprisonment.[13]

The Guidelines seek "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity[,]" *Rita v. United States*, 551 U.S. 338, 349 (2007).  Under this principle, no distinction should be drawn between the holder of funds in a single account and the holder of the same quantum of funds in an

---

[13]    In 2010, the FBAR that was not filed would have reflected a maximum balance of approximately $22,000, 25% of which (approximately $5,500) was owned by Artur.  Because an FBAR filing is not required where the relevant foreign account contains less than $10,000, Artur would not have been required to file an FBAR in 2010 but for the fact that the money of others was also held in the account.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

account in which others also hold funds.  Reflecting this concern, the IRS, in connection with the

assessment of FBAR civil penalties, recently directed its staff to only consider a co-owner's

percentage ownership and not the entire balance of the account:

> Where there are multiple owners of an unreported foreign financial account, examiners must make a separate determination with respect to each co-owner of the foreign financial account as to whether there was a violation and, if so, whether the violation was willful or non-willful.  For each co-owner against whom a penalty is determined, the penalty will be based on the co-owner's percentage ownership of the highest balance of the foreign financial account.

*See* Memorandum from Heather C. Maloy, Commissioner, Large Business and International,

Karen M. Schiller, Commissioner, Small Business/Self-Employed, Sunita B. Lough,

Commissioner, Tax Exempt and Government Entities, Titled "Linda E. Stin: Deputy

Commissioner for Services and Enforcement, titled "Interim Guidance for Report of Foreign

Bank and Financial Accounts (FBAR) Penalties" (May 13, 2015), available at

https://www.irs.gov/pub/foia/ig/spder/SBSE-04-0515-0025[1].pdf.

We thus respectfully request that the Court consider this circumstance in evaluating the

advisory Guidelines.[14]

2.   The Guidelines Calculated Under U.S.S.G. § 2S1.3 Bear no Relationship to the Tax Loss Associated With the Offense Conduct

An additional mitigating factor should also be weighed:  strict application of U.S.S.G. §

2S1.3, as opposed to U.S.S.G. § 2T4.1, would mean that the advisory Guidelines range would

bear no relationship to the tax loss associated with the offense conduct.

Although Chapter Two, Part T ordinarily governs tax offenses, Part T does not apply here

because, per U.S.S.G. § 2S1.3(c)(1), the Guidelines range under U.S.S.G. § 2T1.1 is not "greater

---

[14]   We are not aware of any reported FBAR case in which a defendant's interest in a foreign account constituted a minority fraction of the entire value of the account.

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

than that determined" under U.S.S.G. § 2S1.3.  More specifically, unpaid tax here (federal, state and city) in 2010 and 2011 amounts to $66,953, corresponding to a 14-level increase under U.S.S.G. § 2T4.1(E).  Assuming application of the "sophisticated means" adjustment under U.S.S.G. § 2T1.1(b)(2), and the three-level downward adjustment under U.S.S.G. § 3E1.1, the adjusted offense level under U.S.S.G. § 2T1.1, if applied, would have been 13, yielding an advisory Guidelines range of 12 to 18 months.

The stipulated Guidelines calculation posits that the offense was committed for the purposes of violating the tax laws.  Under the plea agreement, a 2-level increase is provided for under U.S.S.G. § 2S1.3(b)(2), based on a "pattern of unlawful activity," here, tax law violations.  As such, there would appear to be no policy reason under the Guidelines why § 2T1.1 would not apply.  Moreover, we have not identified any reasoning on the part of the Sentencing Commission for the decision to except a tax case from application of § 2T1.1 where the § 2T1.1 calculation is less than the range calculated under § 2S1.3.  Common sense would appear to dictate otherwise, namely, that an FBAR case linked to one or more tax law violations should bear a relationship to tax loss and thus be governed by the tax Guideline.

### E.   A Sentence of Probation Would be Consistent With the Goal of Avoiding Unwarranted Sentencing Disparities

A non-custodial sentence in this case would also promote the avoidance of "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. Section 3553(a)(6); *see also* 28 U.S.C. § 991(b)(1)(B) (purposes of Sentencing Commission include "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices").

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

In offshore account reporting cases across the country, sentencing courts, including in the Southern District of New York, have regularly imposed non-custodial sentences, even where the offense conduct involved higher tax losses and/or unreported accounts containing more assets than at issue here.

As reflected in Exhibit 1,[15] we have identified 75 criminal cases brought against offshore accountholders nationwide.  In 47 of these cases (approximately 63%), a non-custodial sentence was imposed, and in 28, imprisonment was imposed in a range of 1 day to 21 months.  Of the 28 defendants who were sentenced to imprisonment, 22 involved tax losses greater than the $66,953 in issue here.  With the exception of two cases, in which we could not determine the maximum account value, all of the remaining 26 of 28 cases involved undeclared assets abroad greater than Artur's 25% of the funds in issue here.  Moreover, of the 28 defendants sentenced to imprisonment, 20 had Guidelines ranges greater than the 12-18 months that would have applied had Artur placed his funds in a solely owned foreign account.  *See supra* at 12-14.

Among the defendants who received non-custodial sentences were:

- George Briguet, who was charged in the United States District Court for the Eastern District of New York, 15-cr-0050.  Briguet's offense involved a tax loss of $169,935, and he had an undeclared account at UBS that held approximately $4.5 million.  When confronted with evidence of his account at UBS, Briguet lied twice, once to the IRS Revenue Agent and again to an IRS Special Agent, denying that he had any foreign accounts.[16]

---

[15]     Exhibit 1 is based on public information, including docket sheets, sentencing submissions, and judgments information, concerning sentences imposed on offshore accountholder defendants who pleaded guilty.  These pleas concerned only offshore account charges and thus excludes (a) cases charging the enabling of offshore tax reporting violations against, among others, bankers and lawyers, *see, e.g.*, *United States v. Bachmann*, 11-cr-00095 (E.D.Va.); and (b) cases charging criminal conduct more extensive than the failure to file FBARs, *see, e.g.*, Government's Sentencing Memorandum, at 3-4, *United States v. Doane*, 12-cr-00630 (S.D.N.Y.) (charging an unreported business income scheme in connection with Doane's home renovation business).  Because motions pursuant to U.S.S.G. § 5K1.1 are not always readily apparent from docket review, where applicable, Exhibit 1 identifies our grounds for concluding that such a motion was or was not filed.

[16]     Government's Memorandum in Aid of Sentencing, at 4-5, *United States v. Briguet*, 15-cr-00050 (E.D.N.Y.) (ECF No. 19).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

- Peter Canale, who was charged in this District. Canale's offense involved a tax loss of $323,227, and had an undeclared account that contained at least $700,000.[17] "Canale's undeclared account at Wegelin was opened in the name of a sham foundation organized under the laws of Liechtenstein, called the Janara Foundation."[18]

- Albert Cambata, who was charged in the United States District Court for the Eastern District of Virginia, was sentenced to one-year of unsupervised probation, a fine of $15,000, and restitution of $84,849. Cambata's offense involved a tax loss of $84,849, and he had an undeclared account that contained at least $12 million. Cambata used a Hong Kong nominee entity to hold $12 million at a Swiss bank, and did not file a tax return at all for years 2010, 2011, and 2012.[19]

- Gustavo Gardellini, who was charged in the United States District Court for the District of Columbia, 06-cr-335. Gardellini's offense involved a tax loss of $94,116 and he had an undeclared account that contained at least $350,000. Gardellini worked for Esprit Telecom, where, as part of his compensation, he received shares in Esprit Telecom. In connection with one of the stock grants he received, he caused to be transferred $350,000 worth of stock in Esprit Telecom to a friend. At Gardellini's request, the friend sold the shares of stock and transferred the $350,000 in proceeds to Gardellini's account at Barclays Bank, Jersey, Channel Islands. In addition to not filing an FBAR, Gardellini did not report the proceeds from the sale of his Esprit stock on his personal tax return.[20]

- Wolfgang Roessel, who was charged in the United States District Court for the Southern District of Florida, 12-cr-60074. Roessel's offense involved a tax loss of $312,803, and he had undeclared foreign accounts that contained over $10 million. "In 2002, Roessel opened a UBS numbered investment account in the nominee name of a foreign entity, Neptune Trust, with an opening balance of approximately $4-5 million. In around 2004, this account and subaccounts were transferred into the nominee name of another foreign entity, Cyan United, and traded in U.S. and foreign securities."[21] "In 2008 and 2009,

---

[17]     Government's Sentencing Memorandum, at 2-5, *United States v. Canale*, 14-cr-713 (S.D.N.Y.) (ECF No. 39).

[18]     Press Release, U.S. Attorney's Office, Southern District of New York, Kentucky Resident Pleads Guilty In Manhattan Federal Court To Hiding Hundreds Of Thousands Of Dollars In Secret Swiss Bank Accounts (August 5, 2015), available at https://www.justice.gov/usao-sdny/pr/kentucky-resident-pleads-guilty-manhattan-federal-court-hiding-hundreds-thousands.

[19]     Position of the United States on Sentencing, at 2-3, *United States v. Cambata*, 15-cr-362 (E.D.Va.) (ECF No. 17).

[20]     Statement of Facts, at 1-2, *United States v. Gardellini*, 06-cr-355 (D.D.C.) (ECF No. 7).

[21]     Press Release, U.S. Attorney's Office, Southern District of Florida, South Florida Retired Businessman Pleads Guilty to Failing to Disclose Assets Held in Swiss Banks (May 30, 2012), available at

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

during which period the defendant was aware of the government's grand jury investigation into his foreign UBS accounts, the defendant disclosed only the existence of the UBS accounts on his tax returns for those years and did not report" his interest in accounts at "another Swiss bank."[22]

- Ty Warner, who was charged in the United States District Court for the Northern District of Illinois, 13-cr-731.  Warner, the creator of Beanie Babies, was charged with a tax loss of $5,594,877, and he had undeclared foreign accounts that contained over $100 million. One of Warner's accounts was at Zuercher Kantonalbank, and rather than open the account in his own name, "Warner opened the account in the name of a purported Liechtenstein entity, the 'Molani Foundation,' which effectively concealed his identity as the account holder."[23]

- Jacques Wajsfelner, who was charged in this District.  Wajsfelner's offense involved a tax loss of $419,940, and he had an undeclared account that contained at least $5.5 million.  Wajsfelner opened an account at Credit Suisse "in the name of a sham corporation formed under the laws of Hong Kong, Ample Lion Ltd. . . .  to obscure his ownership of the assets in the account from the IRS."[24]  When Credit Suisse exited the U.S. cross-border banking business, Wajsfelner transferred the assets in his account at Credit Suisse to another undisclosed account at Wegelin & Co.[25]  When Wajsfelner was confronted by Special Agents of the Internal Revenue Service, Criminal Investigation Division, with evidence of his ownership of foreign bank accounts, he "blatantly" lied.[26]

---

https://www.justice.gov/opa/pr/south-florida-retired-businessman-pleads-guilty-failing-disclose-assets-held-swiss-banks.

[22]    *Id.*

[23]    Press Release, U.S. Attorney's Office, North District of Illinois, H. Ty Warner Sentenced To Probation After Paying $80 Million In Taxes And Penalties For Tax Evasion On Funds Hidden In Secret Swiss Bank Accounts (January 14, 2014), available at https://www.justice.gov/usao-ndil/pr/h-ty-warner-sentenced-probation-after-paying-80-million-taxes-and-penalties-tax-evasion.

[24]    Press Release, U.S. Attorney's Office, Southern District of New York, Massachusetts Man Sentenced In Manhattan Federal Court For Hiding Millions From IRS In Swiss Bank Accounts (March 5, 2013), available at https://www.justice.gov/usao-sdny/pr/massachusetts-man-sentenced-manhattan-federal-court-hiding-millions-irs-swiss-bank.

[25]    *Id.*

[26]    Government's Sentencing Memorandum, at 2-3, *United States v. Wajsfelner*, 12-cr-641 (S.D.N.Y.) (ECF No. 10).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

None of the above-listed defendants were the subject of a 5K1.1 motion, the conduct of each was

associated with a higher tax loss than here, and each held more assets in the unreported account

than here.

Even where defendants have received custodial sentences, *see* Exhibit 1, such sentences

have been substantially below the applicable advisory Guidelines ranges.  Of the 28 defendants

who received custodial sentences, only 3 were sentenced within the applicable Guidelines range;

the remaining 25 were sentenced below the range.  For example, Michael Reiss, whose case

involved a tax loss of more than $400,000, was sentenced to one day of imprisonment where the

Guidelines range called for between 30 and 37 months' imprisonment.[27]  Kenneth Heller, whose

tax loss figure was greater than $400,000,[28] was sentenced to 45 days' imprisonment where the

Guidelines range called for between 30 and 37 months' imprisonment.[29]

As a general matter, where sentences in these cases have exceeded 6 months, special

factors appear to have been at work.  For example, Judge Chin sentenced Federico Hernandez to

a term of imprisonment of 1 year and 1 day.  Hernandez, whose guidelines range was calculated

based on a tax loss of $84,000, actually, according to the Government caused a tax loss of

$510,193.[30]  Hernandez also maintained accounts that contained approximately $8.8 million, and

---

[27]     Government's Sentencing Memorandum, at 8, *United States v. Reiss*, 11-cr-668 (S.D.N.Y.) (ECF No. 16).
Reiss opened an undisclosed foreign account in the name of Floranova Foundation, a "sham foundation" formed
under the laws of Liechtenstein, to "obscure[] his ownership of the assets in the account from the IRS."  Press
Release, U.S. Attorney's Office, Southern District of New York, New Jersey Doctor and Medical Professor
Sentenced in Manhattan Federal Court for Failing to Inform the IRS of Millions in Swiss Bank Accounts (January
11, 2012), available at https://www.justice.gov/archive/usao/nys/pressreleases/January12/reissmichael
sentencing.html.

[28]     Plea Agreement, at 2-3, *United States v. Heller*, 10-cr-388 (S.D.N.Y.) (ECF No. 58 at Ex. G).

[29]     Sentencing Memorandum, at 2, *United States v. Heller*, 10-cr-388 (S.D.N.Y.) (ECF No. 59).

[30]     Sentencing Memorandum, at 3, *United States v. Hernandez*, 10-cr-334 (S.D.N.Y.) (ECF No. 11).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

under-reported his income in certain years to a degree that permitted him to "claim[] the Earned

Income Tax Credit," resulting "in a net public assistance payment of $2,211 from the U.S.

Government."[31]  And, although UBS records showed that Hernandez "had a net worth of $20.2

million as of 2006," he implausibly claimed to the Probation Department that he had a "negative

net worth."[32]  To cite another example, David Alan was sentenced to 21 months of

imprisonment, the longest sentence among the offshore account defendants that we have

identified.  In his case, the tax loss was between $80,000 and $200,000.[33]  He maintained a

foreign account that had a balance of $500,000.[34]  Alan, who owned an optical partnership

business, formed a foreign corporation to "receive pretax moneys from Dr. Alan's optometry

practice business in the guise of payments for supplies for that business."[35]  Though this scheme,

Alan underreported his income by staggering amounts.  For calendar year 2001, Alan reported

income of $20,254 when, in fact, his income was $148,785.[36]  For calendar year 2002, Alan

reported income of $38 when, in fact, his income was $242,740.[37]  And, when he was confronted

about the evasion scheme, Alan lied to IRS agents.[38]

---

[31]     Sentencing Memorandum, at 6, *United States v. Hernandez*, 10-cr-334 (S.D.N.Y.) (ECF No. 11).

[32]     *Id*. at 12.

[33]     Defendant's Sentencing Memorandum, at 2, *United States v. Alan*, 10-cr-160 (W.D. Pa.) (ECF No. 56).

[34]     Government's Response to Defendant's Sentencing Memorandum, at 13, *United States v. Alan*, 10-cr-160 (W.D. Pa.) (ECF No. 62).

[35]     *Id*. at 4.

[36]     Indictment, at 1, *United States v. Alan*, 10-cr-160 (W.D. Pa.) (ECF No. 56).

[37]     *Id*. at 2.

[38]     Government's Response to Defendant's Sentencing Memorandum, at 5, *United States v. Alan*, 10-cr-160 (W.D. Pa.) (ECF No. 62).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

Moreover, non-custodial and below-Guidelines sentences in offshore account cases have not been limited to defendants who pleaded guilty and accepted responsibility for their actions. *See United States v. Ahuja*, 11-cr-135 (E.D. Wisc.) (ECF No. 203) (sentence of 3 years' probation after a guilty verdict, where the tax loss was $967,944.66 and the guidelines range called for incarceration of between 41 and 51 months[39]); *United States v. Desai*, 11-cr-846 (N.D. Cal.) (ECF No. 288) (sentence of 6 months' imprisonment after a guilty verdict, where the tax loss was $378,099, the "value of funds" was $19,346,801.60, and the guidelines called for incarceration of between 78 and 97 months[40]).

Based on the above sample, as further elaborated in Exhibit 1, a non-custodial sentence here would be entirely consistent with past sentences imposed on defendants who, broadly speaking, are similarly situated to Artur.

### F.   Neither Specific Nor General Deterrence Will Be Served by a Custodial Sentence

In the circumstances of this case and this defendant, we respectfully submit that a non-custodial sentence would serve the purpose of specific deterrence.  The multi-year investigation culminating in this prosecution, and the prospect of a sentence of imprisonment, has caused considerable stress on Artur, his family and his business partners and friends.[41]  There is no realistic prospect of recidivism on Artur's part given these consequences.

---

[39]     *See* Government's Sentencing Memorandum, at 1, 22, *United States v. Ahuja*, 11-cr-135 (E.D. Wisc.) (ECF No. 194).

[40]     Government's Sentencing Memorandum, at 8, 10, 20, *United States v. Desai*, 11-cr-846 (N.D. Cal.) (ECF No. 279).

[41]     *See* Plea Hearing Transcript (Jan. 11, 2016) ("THE COURT:  Are you now or have you recently been under the care of a doctor or a psychiatrist?  THE DEFENDANT:  Recently.  Six months ago.  THE COURT:  I think at the time you waived indictment you indicated that you were being treated for anxiety.  THE DEFENDANT:  That's correct.  THE COURT:  I said then, I'll say now, under your life circumstances right now you have reasons to be anxious.  Notwithstanding that, do you think you understand what's going on relative to your plea?  THE DEFENDANT:  Absolutely.")

-21-

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

In addition, the financial consequences of Artur's conviction -- the FBAR civil penalty, back-taxes, interest, and applicable civil fraud penalties -- will consume a very substantial portion of Artur's net worth and far exceed the amounts of his money involved in this offense. These devastating financial results provide another strong element of specific deterrence.

Mr. Melentin's status as a felon also carries a risk that that his businesses will lose future opportunities to the extent that background checks report his criminal conviction. And, he will be subject to the social opprobrium that comes with his criminal status.

Finally, the letters submitted with this Memorandum from Artur's family and friends provide insight into his character, reflection on the instant episode and the shame that he feels. Nothing in these letters suggests that he will re-offend.

A sentence of imprisonment is also unnecessary to further the objective of general deterrence. *See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (rejecting government's contention that affirming a probationary sentence imposed in criminal tax case would lessen deterrent value of criminal law "because it elevates one § 3553(a) factor – deterrence – above all others. As § 3553(a) makes clear, the district court at sentencing must consider and balance a number of factors – not all of which will point in the same direction."); *United States v. Tomko*, 562 F.3d 558, 563 (3d Cir. 2008) (*en banc*) (affirming a sentence of probation, community service, restitution, and fine for a tax evasion conviction, and rejecting the government's argument that "failure to incarcerate [the defendant] would send a message that a rich defendant can buy his way out of prison, and would compromise the general deterrent effect that tax laws have on potential tax cheats."). Noncustodial sentences are common in FBAR cases, *see supra*, and this has not detracted from general deterrence. The mere prosecution of

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

cases in the criminal system has a strong effect on general deterrence.   As the government has

explained:

> In addition to the specific deterrence that results from the Division's enforcement efforts in connection with unreported foreign financial accounts, these prosecutions have triggered remarkable general deterrence. The publicity surrounding the Tax Division's enforcement efforts, operating alongside the Internal Revenue Service's Offshore Voluntary Disclosure Initiatives, have resulted in an unprecedented number of taxpayers - over 38,000 since 2009 – voluntarily disclosing to the IRS their previously hidden foreign accounts and agreeing to pay billions of dollars in back taxes, interest and penalties to the U.S. Treasury. As a result, these enforcement efforts not only remedy past wrongdoing, but also bring into the system tax revenue from taxpayers who become compliant going forward.

"Offshore Compliance Initiative," https://www.justice.gov/tax/offshore-compliance-initiative.

 We respectfully submit that in view of the above, any incremental general deterrent

effect from a term of imprisonment in this case would be *de minimis*.

### G.    Available Sentences

Although available to the Court, a sentence of imprisonment here would be more than

"necessary," and could generate significant collateral consequences for Findr Group and its

employees.  *See* Ex. 5.  In lieu of such a sentence, we would respectfully request a sentence of

probation.

The Supreme Court has explained that a probationary sentence serves as both a

punishment and a general deterrent because it substantially restricts the defendant's liberty:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ('Inherent in the very liberty to which ever citizen is entitled.') (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court. 552 U.S. at 48 (footnote omitted).

*SENTENCING MEMORANDUM ON BEHALF OF ARTUR MELENTIN*
*(Cont'd)*

*Gall v. United States*, 552 U.S. 38, 48-49 (2007).

   Such restrictions would be meaningful here, because they would serve as a continuing, strong reminder to this defendant of his errors.  Moreover, a sentence of probation would serve the salutary purpose of permitting Artur to continue without interruption to lead and contribute to the business to which he is so central; would allow him to earn additional money to complete any payments and penalties to the IRS; and would permit him to continue his good works on behalf of community causes, all without detracting from the goal of deterrence in the arena of FBAR reporting enforcement.

## II.  REQUEST FOR SENTENCE OF PROBATION

   For the reasons discussed above and in the sentencing letters submitted herewith, we respectfully request that this Court impose a non-custodial sentence.

Dated: May 16, 2016        Respectfully submitted,
   New York, New York

                PETRILLO KLEIN & BOXER LLP

                By: */s/ Guy Petrillo*

                Guy Petrillo
                (gpetrillo@pkbllp.com)

                Daniel Goldman
                (dgoldman@pkbllp.com)

                655 Third Avenue, 22nd Floor
                New York, New York 10017
                Telephone: (212) 370-0330
                Facsimile: (212) 370-0391